## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

  vs.                                  No. CR 10-1730 MCA

**OSCAR PEREZ CRUZ,**

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendant Oscar Perez Cruz's Motion to Suppress Evidence and Memorandum of Law in Support Thereof* [Doc. 22], filed August 15, 2010. On November 22, 2010, the Court held an evidentiary hearing on Defendant's motion. Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing and in their written closing arguments, and being otherwise fully advised in the premises, the Court denies the motion based upon the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### The Investigation

1.    Agent Devin Verhulst is an employee with the San Juan County Sheriff's Office. He has been so employed since 2006, when he began as a patrol officer. Since approximately January or February of 2009, Agent Verhulst has been assigned to the Region II Narcotics Task Force. As of between February and April of 2010, when the

relevant events underlying the instant action occurred, Agent Verhulst had been with the Task Force for about one year.

2.     Agent Verhulst estimated that, as of February 2010, he had served as the lead investigator on, or case agent for, approximately 10 to 20 narcotics cases that he had "initiated from the ground up." [Doc. 36 at 38].  However, Agent Verhulst estimated the *total* number of narcotics cases he has worked in that time, including cases that came to him through adoption, to be over 50.

3.     From his training and experience in the field of drug interdiction, Agent Verhulst has come to believe and understand that it is not uncommon for drug traffickers to use their homes to hide or "stash" narcotics. He testified that such a belief and understanding comes from having (a) attended a two-week long "DEA basic course;" (b) participated in narcotics investigations in which he assisted other agents; (c) observed the means and methods of drug traffickers while working as a patrol officer "on the street;" and (d) interviewed drug traffickers about their habits.  From having interviewed drug traffickers, Agent Verhulst has learned that the reason they may use their homes as stash houses is that drugs are "a form of currency[,]" [Doc. 36 at 22], which a dealer wants to keep near him and hidden from others in an effort to prevent theft of his product.

4.     In February 2010, the Region II Narcotics Task Force began an investigation of the Defendant, Oscar Perez Cruz, with Agent Verhulst as the case agent.

5.     As Agent Verhulst testified at the suppression hearing, it was in February 2010 that the Task Force began receiving information from a confidential informant ("CI")[1] that a male individual, later identified as Mr. Perez Cruz, was distributing cocaine and methamphetamine throughout San Juan County from a dark-colored Volvo.

6.     Mr. Perez Cruz's identity was confirmed during a February 2010 traffic stop, during which he also stated that he lived at 213 North Lorena Avenue, Farmington, New Mexico.

7.     Task Force agents then began to conduct surveillance on the home at 213 North Lorena Avenue.  They observed Defendant at the residence, as well as the dark-colored Volvo in the driveway, during both day- and night-time hours.

8.     During their surveillance, agents did *not* observe a high volume of traffic going to and coming from the home at 213 North Lorena Avenue.  However, Agent Verhulst testified that this would not have been unusual considering that agents believed 213 North Lorena Avenue to serve as a "quiet house."

9.     Agent Verhulst defined a "quiet house" as a place where drugs are kept, but not from which they are sold.

10.    Agent Verhulst continued to work with the CI.  In April 2010, the CI informed Agent Verhulst that over the course of several months, he had been selling cocaine provided

---

[1] Mr. Perez Cruz has raised no challenge to the CI's credibility.  I therefore find that the CI's credibility is not at issue here

to him by Mr. Perez Cruz.  The CI also told Agent Verhulst that it was Defendant's practice to hide narcotics under the Volvo's vinyl trunk liner.

11.    Exhibit 1 depicts Defendant standing outside a dark blue Volvo, the driver's side door opened, in the carport of 213 North Lorena Avenue.  Exhibit 2 shows Defendant reaching into the trunk of the Volvo. [See Exhs. 1, 2].

12.    Agent Verhulst personally observed the activity depicted in Exhibits 1 and 2.  He testified that, although he "suspected" that Defendant was handling illegal drugs at this time, he in fact had no idea what Defendant was actually doing. [Doc. 36 at 46-47].

13.    I find that Agent Verhulst's belief that Defendant was moving drugs into or out of the Volvo's trunk at this particular time stemmed from nothing more than a hunch.  On the other hand, I do credit as reasonable Agent Verhulst's conclusion that "it was probable that" drugs were being stored at 213 North Lorena Avenue, which conclusion drew on Agent Verhulst's education, training, and personal experience with traffickers who use their homes as drug "stash houses," as well as his investigation of Mr. Perez Cruz. [Doc. 36 at 47].

14.    After conducting surveillance on 213 North Lorena Avenue, Task Force agents decided to set up a "controlled buy" of cocaine from Defendant, using their CI.  To that end, on April 21, 2010, agents supplied the CI with Region II contingency funds, and monitored  the CI, both visually and through use of audio, as he drove to a restaurant to meet Defendant.

4

15.     Instead of meeting the CI, Defendant telephoned the CI and instructed him to proceed to the CI's residence, where the CI entered the   black Monte Carlo in which Defendant arrived.  At the suppression hearing, it was not disputed that, for reasons not fully explained, the men had traded vehicles and that, as of April 21, 2010, Mr. Perez Cruz was driving the CI's Monte Carlo, while the CI was driving Defendant's Volvo.

16.     Following the controlled buy, the CI turned over to Agent Verhulst a plastic baggie containing what subsequently tested positive for cocaine, in an approximate amount of 7.9 grams.  The CI also told Agent Verhulst that he had seen narcotics stored in a compartment under the Monte Carlo's center console.

17.     Notwithstanding, Defendant  was not arrested on April 21, 2010.  When questioned at the suppression hearing as to why he made the decision not to arrest Defendant at that time, Agent Verhulst explained that he had chosen to continue investigating him and building his case instead. [Doc. 36 at 26].

18.     I find and accept as credible Agent Verhulst's explanation as to why he opted not to arrest Defendant on April 21, 2010.

## The Briefing and the Arrest

19.     On April 29, 2010, Agent Verhulst conducted a 9:00 a.m. briefing with agents of the Region II Narcotics Task Force and others.

20.     Among those in attendance was Nathan Kempton, a police officer with the City of Farmington who currently is assigned to the Four Corners Gang Task Force.

5

21.    Officer Kempton has been a Farmington police officer for five years.  He has attended the police academy and received additional training in the fields of gangs, narcotics, and drug interdiction.

22.    Officer Kempton testified that, while the Four Corners Gang Task Force and the Region II Narcotics Task Force are separate units, they are housed in the same building and work together. [Doc. 36 at 72].

23.    At the time of the briefing, Agent Verhulst was in the process of obtaining a warrant for Defendant's arrest for trafficking in controlled substances. [See Exh. B].  The affidavit in support indicates that, on April 21, 2010, the CI had told Agent Verhulst that Defendant "was keeping . . . methamphetamine and . . . cocaine in a compartment under the center console." [Exh. B at 2].  Agent Verhulst relayed this information to those officers and agents at the briefing.

24.    At the suppression hearing, Agent Verhulst testified that, on the morning of April 29, 2010, he received the same information (*i.e.*, that narcotics were secreted in the Monte Carlo's center console) from a second CI.  He did not, however, include in his affidavit that he had again been so advised.

25.    A warrant to arrest Defendant was secured at approximately 11:30 a.m. and subsequently executed by Officer Kempton during a traffic stop.

26.    As Officer Kempton was arresting Defendant, Officers John Garcia and Candice Montoya arrived on the scene.

27.   According to Officer Garcia (since retired from the Farmington Police Department but referred to here as "Officer"), he had heard over his police radio that Officer Kempton had initiated a traffic stop.  Consequently, Officer Garcia, who was in the area, headed to the site to assist as backup, which he described as "common practice." [Doc. 36 at 81].

28.   Officer Garcia also testified that he learned of the warrant for Defendant's arrest when he received a telephone call from an individual he identified as Region II Narcotics Task Force Agent Griego.  Officer Garcia, who stated that he was not present at Agent Verhulst's briefing that morning, testified that he first learned of the existence of the Monte Carlo's hidden compartment from his conversation with Agent Griego.

29.   In this respect, Officer Garcia's testimony was seemingly at odds with that of Agent Verhulst, who testified that Officer Garcia was, in fact, present at the April 29, 2010 briefing. [Compare Doc. 36 at 95 and Doc. 36 at 123-124].

30.   Under the circumstances, I find that whether Officer Garcia was or was not present at the April 29, 2010 hearing is not significant, given that it is undisputed that, before he inventoried the Monte Carlo, as described below, Officer Garcia had been made aware that drugs were hidden in the vehicle's hidden compartment.

31.   Officer Kempton arrested Defendant and placed him in his patrol unit for transport to the Farmington police station, while Officers Garcia and Montoya arrested the

passenger.  At this point, Officer Garcia took over the investigation, having offered

to inventory the contents of the vehicle for Officer Kempton.

### The Inventory of the Monte Carlo

32.   The Farmington Police Department follows approved Policy No. 09-26 ("the tow

policy") with respect to the towing and impounding of automobiles. [See Exh. A].

33.   Among other things, the tow policy states that "[a]n officer *may* consider towing a

vehicle . . . [w]henever the operator of the vehicle has been arrested. . . ." [Exh. A at

3 (emphasis added)].

34.   I find that at the time Officer Garcia took control of the investigation from Officer

Kempton, Defendant had been placed under arrest.

35.   The tow policy also provides that

> [a]n officer *may* consider alternative methods of releasing the
> vehicle to the licensed owner, other than the removing of a
> vehicle by towing, under situations wherein the volume of calls
> for service, roadway conditions, or other circumstances or
> factors allow for an officer to research alternative methods.

[Exh. A at 3 (emphasis added)].

36.   Additionally, the tow policy includes a section captioned, "Mandatory Vehicle

Inventory."  As described therein,

> [a]ny vehicle towed at the direction of a law enforcement officer
> *shall* have a complete inventory of the vehicle's contents
> performed to protect the Farmington Police Department from
> liability and to safeguard the property rights of the owner of the
> vehicle's contents.  Items of obvious value shall be itemized on
> the Removal and Storage Order.

[Exh. A at 3 (emphasis added)].

37.   I find, therefore, that while an officer must conduct an inventory of a towed vehicle, the initial decision to have the vehicle towed or to release it to the registered owner in some other fashion is left to an officer's discretion, as evidenced by the tow policy's use of the permissive "may." [See Exh. A at 3].

38.   Officer Garcia confirmed a similar reading of the tow policy when he testified at the suppression hearing that while he "*could* release the vehicle to the registered owner only if the registered owner was in the vehicle[,] if you're making an arrest from a vehicle you're *gonna* tow the vehicle." [Doc. 36 at 101 (emphasis added)]. While Officer Garcia admitted that the tow policy does not state that the registered owner must be present on scene to receive his vehicle, he also explained that requiring the registered owner's presence was common practice.

39.   In any event, Officer Garcia began his inventory by checking the glove compartment for the vehicle's registration. He testified that it was his practice to begin an inventory with the glove compartment if he approached the vehicle from the passenger's side, which he did in this case. Officer Garcia also explained that if he did not find paperwork in the glove compartment, he routinely would go next to the center console. By contrast, if he approached a vehicle from the driver's side, it was Officer Garcia's practice to look for paperwork in the center console. [Doc. 36 at 84-85].

40.   Noting that he had been informed by Agent Griego that there were drugs concealed in the center console, Officer Garcia was asked why he did not first look in that area.

Officer Garcia explained that he followed the same pattern each time he conducted an inventory, so as not to miss or overlook anything that, in turn, "could come back on [him] and somebody would say, 'Hey, there was $50,000 . . . or a diamond ring . . . or a Rolex watch . . . in the compartment or something.'" [Doc. 36 at 84].

41.   I find and accept as credible Officer Garcia's explanation as to why he conducted his inventories in accordance with the above-described routine or practice, which practice is reasonably consistent with the tow policy's expressed twin goals of "protect[ing] the Farmington Police Department from liability and . . . safeguard[ing] the property rights of the owner of the vehicle's contents." [Doc. A at 3].

42.   Officer Garcia was unable to locate the registration in the glove compartment. Instead, he found sunglasses and "some miscellaneous papers" that he could not describe at the suppression hearing, other than to say they were not checks.  Officer Garcia did not tag these items into evidence.

43.   Having failed to find the registration in the glove compartment, Officer Garcia moved to the center console, specifically the cup-holder portion.

44.   Exhibit 3 depicts the intact cup-holder portion of the Monte Carlo's center console. [Exh. 3].

45.   Officer Garcia testified that it was "absolutely" a normal part of his inventory searches to look in a cup holder. [Doc. 36 at 85].

46.  He also testified that as he was lifting the lid of the Monte Carlo's center console, he felt a looseness in the cup-holder portion, which "just moved in [his] hand completely free." [Doc. 36 at 85].

47.  In his experience, Officer Garcia had previously seen loose cup holders in many vehicles.  He explained that he had also seen compartments underneath cup holders.

48.  Exhibit 4 depicts the center console of the Monte Carlo, its cup-holder portion removed and resting on the passenger seat. [Exh. 4].

49.  Officer Garcia testified that he was able to remove the cup-holder portion of the center console freely, easily, and without manipulation.  He also testified that, in so doing, he exerted "no force at all whatsoever." [Doc. 36 at 85].

50.  Officer Garcia's testimony in this regard was in apparent conflict with that of Gary Ainsworth, a private investigator and consultant who has worked on Defendant's case.

51.  Mr. Ainsworth testified that he had interviewed the registered owner of the Monte Carlo, and that the owner told him that, when he received the vehicle back from the Farmington Police Department, "the console was broken and that there was a liner in the console and the—the screws to the liner were—stripped out." [Doc. 36 at 135].

52.  However, Mr. Ainsworth also testified that the registered owner had stated that (1) he did not use the Monte Carlo "that much[;]" (2) he and Mr. Perez Cruz had previously "swapped" vehicles; and (3) after the trade, "he wasn't really sure what happened with the vehicle." [Doc. 36 at 135].

53. There was no evidence presented at the suppression hearing to support a finding that Mr. Ainsworth ever personally observed the Monte Carlo's center console or cup holder. For this reason, I find that Mr. Ainsworth lacked any first-hand knowledge of the condition of the center console on the date in question and, instead, his testimony was based solely on what he later learned as a result of speaking with the Monte Carlo's owner.

54. Exhibits 4 and 5 depict the center console of the Monte Carlo with the cup holder removed, and show what Officer Garcia described as "notches" that he believes are designed to keep the cup holder down. [See Exhs. 4, 5].

55. From Exhibits 4 and 5, I discern no obvious scratch, scrape, or pry marks, nor do I see any other indications that Officer Garcia used force to remove the cup-holder portion of the console. Accordingly, I find and accept as credible Officer Garcia's testimony that the cup holder was loose and that it lifted up freely in his hands, without force and without manipulation.

56. Once the cup-holder portion of the console was removed, Officer Garcia observed what he described as "another compartment" inside the cavity underneath the cup holder. In Officer Garcia's words, he "looked down into there and [saw] what looked like a camera case and a couple— and two cell phones, a flashlight, and a pen." [Doc. 36 at 85].

57. I find that the cavity underneath the cup-holder portion of the center console was being used as a container. I also find that the items (camera case, cell phones,

flashlight, and pen) described by Officer Garcia appeared in plain view once the cup holder was removed.

58.   Officer Garcia testified that he then unzipped the pouch that he believed to be a camera case, explaining that "any electronics are gonna go on the inventory sheet. . . ." [Doc. 36 at 87; see also Exh. A at 3 (Farmington Police Department Policy and Procedure mandating that, during vehicle inventory, "[i]tems of obvious value shall be itemized on the Removal and Storage Order.")].

59.   I find that when he unzipped what he believed to be a camera case, Officer Garcia was acting in accordance with *Farmington Police Department Policy and Procedure* concerning mandatory vehicle inventories. [See Exh. A at 3].

60.   Inside the pouch were (1) two clear bags, "one with white powdery substance and one with crystal substance[,]" [Doc. 36 at 87]; (2) digital scales; (3) rolling papers; and (4) smaller baggies containing what Officer Garcia believed from training and experience to be methamphetamine and cocaine residue. [Id. at 87-88; see also Exh. 6].

61.   The substances that Office Garcia discovered tested positive for methamphetamine and cocaine.

62.   Officer Garcia then ended his inventory, sealed the vehicle, and had it towed to a secure police impound yard.  As a consequence, Officer Garcia did not search the vehicle further.

63.     Exhibit E is a *Search Warrant Inventory Sheet* used by the Region II Narcotics Task

        Force, and it shows that on April 29, 2010, Task Force agents conducted an inventory

        of the Monte Carlo that began at 1425 pm (2:25 p.m.) and ended at 1450 pm (2:50

        p.m.).  Among the items listed on the inventory sheet are a Ruger handgun, a Dell

        laptop computer, and a Hewlett-Packard laptop computer.

64.     No evidence was presented at the suppression hearing tending to establish that, during

        his inventory, Officer Garcia prepared a log of the items listed on the Task Force

        *Search Warrant Inventory Sheet* (or of a television he stated was in view on the

        Monte Carlo's backseat), notwithstanding (1) his representation that "any electronics

        are gonna go on the inventory sheet[;]" [Doc. 36 at 87]; and (2) Farmington Police

        Department Policy and Procedure mandating that, during a vehicle inventory, "[i]tems

        of obvious value shall be itemized on the Removal and Storage Order." [Exh. A at 3].

65.     However, Officer Garcia credibly testified that once he discovered the above-

        described items under the Monte Carlo's cup holder, he stopped what he was doing

        and "sealed the vehicle up with evidence tape[, a]ll the doors, the windows, the—the

        hood, the trunk." [Doc. 36 at 107].

66.     Officer Garcia then advised the Region II Narcotics Task Force of what he had found

        and had the Monte Carlo towed to the impound yard.  Task Force agents logged the

        inventoried items during their subsequent, warrant-supported search of the vehicle.

67.    I find reasonable the manner in which Officer Garcia conducted his inventory, and I also find that his method was designed to produce a record of items in the Monte Carlo.

68.    I further find that it is reasonable to infer that the there is no evidence of Officer Garcia's having logged the laptops or the television because he sealed the vehicle once he discovered narcotics under the cup-holder portion of the center console, and that the inventoried items (i.e., the laptop computers and the Ruger) were discovered in areas that Officer Garcia had yet to reach.

## The Warrant to Search 213 North Lorena Avenue

69.    After Defendant had been arrested, Agent Verhulst secured a warrant to search the home at 213 North Lorena Avenue. [Doc. 36 at 55; see also Exh. B-1.]

70.    It is undisputed that (1) when he applied for the search warrant Agent Verhulst had not observed a high volume of traffic going to or coming from the home at 213 North Lorena Avenue; (2) no controlled buy had been conducted out of the home; (3) Agent Verhulst had not been advised by an informant or informants that drugs were being stored at the home; and (4) Agent Verhulst possessed no direct evidence that there were drugs in the home. [Doc. 36 at 45-46.]

71.    Instead, in his affidavit for the search warrant, Agent Verhulst cited "the totality of the investigation" in support of his "belie[f that] it is probable that Jose Perez Cruz utilizes the residence located at 213 N. Lorena as a location to store/stash the illicit substances he distributes." [Exh. B-1 at 7.]

15

72.   In his affidavit, Agent Verhulst also explained that (1) a months-long investigation had led Task Force agents to understand that Defendant was selling "dope," cocaine, and "large amounts of methamphetamine," which he would conceal in the trunk of his Volvo; (2) the CI had stated that he (the CI) had "personally observed [Mr. Perez Cruz] with large amounts of US Currency, and that Mr. Perez Cruz "always carrie[d] large amounts of cash on him; (3) the CI estimated that Defendant typically carried approximately $10,000 or more; (4) Task Force agents had observed Defendant's Volvo (and later the black Monte Carlo) in the driveway of 213 North Lorena Avenue; (5) Task Force agents had "numerous times" observed Defendant "coming and going from" the home at 213 North Lorena Avenue; (6) Task Force agents believed that Defendant "definitely live[d] at 213 N. Lorena[;]" and (7) given his training and experience in the field of narcotics interdiction, Agent Verhulst believed that drug traffickers tend to keep narcotics, cash, drug-packaging materials, notes, ledgers, and other evidence of drug-trafficking sales and distribution "where the drug trafficker/drug dealer has ready access to them, such as [his] residence[ . . . ] and [his] vehicle[]." [See generally Exh. B-1].

73.   On June 10, 2010, Defendant was charged in a 3-count *Indictment* with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 1); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 2); and carrying a firearm during and in

relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3). [Doc. 2].

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On August 15, 2010, Defendant filed the suppression motion that is now before the Court, seeking to exclude "all evidence seized from the vehicle [he] was driving on April 29, 2010 and from his home at 213 Lorena Avenue, Farmington, New Mexico. . . ." [Doc. 22 at 1]. He contends that the inventory search conducted by Officer Garcia does not come within any exception to the Fourth Amendment's warrant requirement because it was in actuality just an excuse to rummage for incriminating evidence, rather than an effort to produce a valid inventory of items in the Monte Carlo. [Id. at 3]. He seeks to exclude evidence seized from the home at 213 North Lorena Avenue on grounds that (1) no probable cause supported the warrant; and (2) the information included in the warrant had become stale. [Id. at 7-12].

### A.      The Inventory Search

"A lawful inventory search promotes three administrative purposes: 'the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.'" United States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2008) (quoting South Dakota v. Opperman, 428 U.S. 364, 369(1976)). An inventory search does not violate the Fourth Amendment simply because the police do not use the least intrusive means available, but such a search must follow "standardized inventory procedures[,]" Illinois v. Lafayette, 462 U.S. 640, 648 (1983)), that are actually "designed to produce an inventory."

Florida v. Wells, 495 U.S. 1, 4 (1990).  In other words, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence [and t]he individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime[.]'" Id. (*quoting* Colorado v. Bertine, 479 U.S. 367, 376 (1987)).

On the other hand, an inventory search conducted under standardized procedures is not invalidated merely because of "a police expectation that the search will reveal criminal evidence." United States v. Lopez, 547 F.3d 364, 372 (2nd Cir. 2008).  Additionally, while good and bad faith on the part of the police play a part in the reasonableness of inventory searches, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.  Bertine, 479 U.S. at 374.

Defendant likens his situation to that existing in United States v. Lugo, wherein the Tenth Circuit reversed the district court's denial of the defendant's motion to suppress evidence (cocaine) seized from his truck, when that evidence had been concealed behind the passenger side door panel.  United States v. Lugo, 978 F.2d 631, 633-634, 637 (10th Cir. 1992).  The district court had upheld the search under both the "search incident to arrest" and "community caretaking" exceptions to the warrant requirement.  Id. at 632.  The circuit, however, concluded that (1) because the search was conducted after the defendant had been removed from the scene, the search was not valid as one incident to arrest; and (2) the

"community caretaking" exception, which permits police to remove a weapon from an impounded vehicle, did not apply to drugs. Id. at 634-636. The circuit also rejected the government's argument that officers had seized the cocaine as part of a permissible inventory search. In so doing, the circuit (1) reviewed the purposes that an inventory search is designed to serve; (2) emphasized the importance of standardized criteria to ensure that an inventory search does not devolve into a general rummaging for incriminating evidence; and (3) ultimately concluded that "searching behind the door panel of a vehicle does not qualify as "standard police procedure," and does not serve the purpose of "protecting the car and its contents" under any normal construction of those terms. . . ." Id. at 636-637 (*quoting* Opperman, 428 U.S. at 372, 373).

In this case, Defendant Perez Cruz contends that

> [t]he removal and dismantling of the center console was equivalent to the type of search the officer in Lugo . . .conducted. Removing the cup holder portion of the console failed to serve the purpose of protecting the car and its contents. Therefore, the search conducted by the officers of the Monte Carlo was a warrantless search which does not fall under any of the exceptions to the warrant requirement. In fact, given the facts of this case, it is logical to conclude that the purported "inventory search" was a ruse for a general rummaging in order to discover incriminating evidence.

[Doc. 22 at 5]. Lugo is distinguishable from the instant situation.

In Lugo, the circuit determined that searching behind a door panel neither qualifies as "standard police procedure" nor serves the purpose of protecting the vehicle and its contents. Lugo, 978 F.2d at 637. By contrast, *Farmington Police Department Policy and*

*Procedure* includes approved Policy No. 07-33, which specifically states that an inventory search of a seized vehicle

> *will* consist of documentation of all personal property contained inside the vehicle, *including property inside closed compartments* or locked containers within the vehicle[, as t]he purpose of the inventory search is to protect the owner's property; to protect the police department against claims of lost, stolen, or vandalized property; and to guard the police from potential danger.

[Doc. 27; attached "*Farmington Police Department Policy and Procedure*" at 3 (emphasis added)].  Moreover, while the searching officer in <u>Lugo</u> testified that removing a speaker cover to look inside a door panel, which is what he did, was not part of a routine inventory search, <u>see</u> <u>Lugo</u>, 98 F.3d at 634 n.4, Officer Garcia testified here that it was "absolutely" a normal part of his inventory searches to look in cup holders, which was what he was doing when the loose cup "moved in [his] hand completely free."  [Doc. 36 at 85].

I also am unpersuaded by any argument that the cavity underneath the Monte Carlo's cup holder was a hidden space in the sense that the area behind the door panel in <u>Lugo</u> was a hidden space, and that for this reason the cavity in question should not be deemed a "compartment" or "container" within the meaning of the Farmington Police Department policy quoted above.  Similar arguments have already been made and rejected by other courts.  For example, in <u>United States v. Corral-Estrada</u>, the United States District Court for the District of Utah denied the defendant's motion to suppress evidence recovered pursuant to a search incident to arrest, and found underneath a loose center console in the defendant's vehicle.  <u>United States v. Corral-Estrada</u>, 2007 WL 2572371 (D.Utah, Sept. 4, 2007).

Because the Corral-Estrada search was one incident to an arrest, the court analyzed its reasonableness under the rule of New York v. Belton, which is that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." New York v. Belton, 453 U.S. 454, 460 (1981). Belton continued: "It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." Id. Belton defined "container" as "any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment. . . ." Id. at 460 n.4.

Noting first that "[o]bviously, the center console itself would be considered a 'container' under Belton[,]" the court in Corral-Estrada then found that, while the space underneath the console "was not specifically manufactured to be used for storage, in this case, the center console was modified so that the space beneath it could be used as a hidden storage compartment." Corral-Estrada, 2007 WL 2572371, at *5. Rejecting the defendant's argument that the searching officer had unreasonably dismantled the vehicle when he removed the console, the court explained that tool marks around and the looseness of a console insert would have alerted the searching officer that there might have been some sort of container or receptacle under the console that was capable of holding another object. Additionally, the searching officer did not need to employ force to remove the console insert;

instead, he merely lifted it out, revealing methamphetamine and methamphetamine pipes. Id. Given these facts, the court held the space beneath the console to be a "container" within the meaning of Belton, the search of which was reasonable as one incident to the defendant's arrest.  Id.

A similar situation arose more recently in United States v. Dixon, where the defendant moved, among other things, to suppress evidence (cocaine and cocaine base) that officers discovered underneath a "loose and moveable" cup holder in the center console of the defendant's minivan.  United States v. Dixon, 2010 WL 3167381, at *1 (W.D.N.Y. May 26, 2010).  The court denied the motion, holding that the search of the area underneath the loose center console was valid as (1) a search incident to the defendant's arrest; and (2) an inventory search conducted in conformity with standard police procedures aimed at protecting the defendant's property.  Id. at *3.

For reasons explained above, I find and accept as credible Officer Garcia's testimony that the cup holder in the Monte Carlo's center console was loose and that it lifted up freely in his hands, without force and without manipulation.  It was not necessary for Officer Garcia to bend back any part of the vehicle, or initiate the type of intrusion as in Lugo.  See Lugo, 978 F.2d at 634 ("Sabourin then bent back the door panel along the existing crease, at the point where the door panel was not attached to the door, reached inside the door panel, and removed the paper bag.").  Additionally, whereas our Tenth Circuit in Lugo concluded that standard police procedure did not contemplate searching behind the door panel of a vehicle, it is the policy of the Farmington Police Department to search and inventory all personal

property contained inside a seized vehicle, "including property inside closed compartments or locked containers within the vehicle." [Doc. 27; attached "Policy and Procedure" at 3].

In the present case, the area underneath the Monte Carlo's cup holder was, at all relevant times, being used as a container, in the sense that it was serving as "an[] object capable of holding another object." Belton, 453 U.S. at 460 n.4.  Persuasive authority supports upholding the search of such an area, see Corral-Estrada, 2007 WL 252371 and Dixon, 2010 WL 3167381, and this Court also has previously upheld a contraband-revealing search of the area underneath the cup-holder portion of an impounded vehicle's center console on the ground that the contraband (a firearm), which was visible in plain view with the cup holder's removal, would inevitably have been discovered in the course of a lawful inventory search conducted as part of forfeiture proceedings.  See United States v. Webster, CR 05-1197 MCA (Doc. 39, *Memorandum Opinion and Order Denying Defendant's Motion to Suppress* at 29-30).

Consequently, I reject Defendant's conclusion that (1) the removal of the center console in this case "was equivalent to the type of search the officer in Lugo . . . conducted[;]" and that (2) removing the cup holder failed to serve the purpose of protecting the car and its contents. [Doc. 22 at 5].  Instead, I conclude that the facts of this case are distinguishable from those presented in Lugo, and also that Officer Garcia's removal of the cup holder was done pursuant to Policy No. 07-33 of *Farmington Police Department Policy and Procedure* and for the dual purposes of both (1) protecting Officer Garcia and the

Farmington Police Department from any claims of loss or theft; and (2) safeguarding valuables that might have been stored in the area in question.

Further, I am not persuaded by any suggestion that the inventory search in this case is invalidated by (1) officers' pre-existing knowledge of the likely presence of narcotics underneath the cup holder; (2) Officer Garcia's failure to produce a complete inventory of the contents of the Monte Carlo, or (3) Officer Garcia's decision to have the vehicle towed instead of contacting the registered owner to retrieve it.

As for the first point, so long as an inventory search follows standardized procedures and is not undertaken in bad faith or for solely investigative purposes, it is inconsequential that officers may "be motivated in part by criminal investigative objectives." Lopez, 547 F.3d at 372. Thus, the fact that Officer Garcia began his inventory with the glove compartment, as he credibly testified was his practice whenever he approached a vehicle from the passenger's side, rather than heading straight for the cup-holder portion of the center console, where he had been advised he likely would find hidden narcotics, reasonably supports the conclusion that his objective was to inventory the contents of the vehicle and not just to gather evidence of criminal conduct.

That Officer Garcia did not inventory such items as a television on the backseat, laptop computers found in the trunk, a handgun, and a purse on the floor is reasonably explained by the fact that once he found narcotics under the cup holder, he stopped his inventory, sealed up the vehicle, and had the vehicle towed to a secured impound yard. He did not inventory these items because he had not reached them as of the time he discovered

24

the narcotics.  Again, Officer Garcia credibly explained a methodical process by which, when approaching a vehicle from the passenger's side, he would  first check the glove compartment for paperwork, then move to the center console.   In this case, he found contraband in the center console.  As a result, he then ended his search.

Likewise, where the Farmington Police Department's tow policy commands that, during an inventory, "[i]tems of obvious value shall be itemized[,]" I conclude that it was not unreasonable for Officer Garcia to have excluded (or opted not to tag into evidence) such items in the vehicle as children's clothing, women's sunglasses, and papers that he knew "weren't checks." [Doc. 36 at 100].   For one thing, police officers have discretion to determine the manner in which they conduct inventory searches, see Wells, 495 U.S at 4; for another, not every object contained in a vehicle must be individually identified before an inventory may be deemed constitutionally valid, see Lopez, 547 F.3d at 371-372.[2]  Finally,

_____

[2]  As the Second Circuit explained in Lopez:

> The concept of an inventory does not demand the separate itemization of every single object.
>  . . .
> That an officer might use a catch-all to cover objects of little or no value in no way casts doubt on the officer's claim that the purpose of the search was to make an inventory. It would serve no useful purpose to require separate itemization of each object found, regardless of its value, as a precondition to accepting a search as an inventory search. Such an obligation would furthermore interfere severely with the enforcement of the criminal laws by requiring irrational, unjustified suppression of evidence of crime where officers, conducting a bona fide search of an impounded vehicle, found evidence of serious crime but, in making their inventory, failed to distinguish between the maps of Connecticut and New York, or failed to list separately the soiled baby blanket or a pack of gum. Imposing a requirement to identify each item separately, regardless of lack of value, would furthermore add

it is reasonable to infer that these non-inventoried items (the clothing, sunglasses, and papers that "weren't checks") were not logged because they were not deemed "[i]tems of obvious value" under the tow policy.

At the suppression hearing counsel for Defendant made the point that the Monte Carlo "could have been released to the registered owner and it was not because this search was essentially an excuse for finding evidence.  It was not truly an inventory search."  [Doc. 36 at 104].  Referring to policy and procedure of the Farmington Police Department, counsel continued, "the standard procedures with regard to when a vehicle should be towed is relevant to show that there was an alternative method that the officers could have followed in this case besides impounding the vehicle and conducting the inventory search." [Id.].  In support of her argument, counsel cited the Court to United States v. Tueller, 349 F.3d 1239 (10th Cir. 2003). [Id.].  In Tueller, *upon the request* of the driver/defendant, the arresting officer agreed to allow the driver's friends to come remove the vehicle from the scene. When the friends failed to arrive in a timely manner, the officer had the vehicle towed.  The fact that the arresting officer initially agreed to the friends' retrieval, as opposed to ordering a tow, however, was in no way central to the holding of the case, which is that an inevitable search of the trunk would have been lawful, notwithstanding that officers, lacking a key, would have had to break into it.  Tueller, 349 F.3d at 1245-46.

_____

considerable administrative burden without in any way advancing the purposes of the Fourth Amendment to protect the public from "unreasonable searches and seizures."

Lopez, 547 F.3d at 371-372.

In this case, while Officer Garcia testified that there were, in fact, circumstances under which he could have released the Monte Carlo to the registered owner, "if you're making an arrest from a vehicle you're gonna tow the vehicle."  [See Doc. 36 at 101].  His expressed understanding of the relevant procedure finds support in Policy No. 09-26 of the *Farmington Police Department Policy and Procedure*, which provides that "[a]n officer *may* consider alternative methods of releasing the vehicle to the licensed owner, other than the removing of a vehicle by towing," but also states that "[a]n officer *may* consider towing a vehicle . . . [w]henever the operator of the vehicle has been arrested. . . ." [Exh. A at 3 (emphasis added)].  Nothing in Policy No. 09-26 demands that the arresting officer consider alternatives to towing, and nothing therein states that the officer must offer the driver the option of allowing the registered owner or anyone else to come and retrieve the vehicle.  For all the reasons expressed above, I conclude that the inventory search was constitutionally valid.

### B.   The Validity of the Warrant to Search the Monte Carlo and the Home at 213 North Lorena Avenue

#### 1.   Fruit of the Poisonous Tree

Defendant next contends that evidence seized as a result of the warrant-supported searches of the vehicle and his home must be suppressed because (1) such evidence amounts to "fruit of the poisonous tree" (the "poisonous tree" being the removal of the Monte Carlo's center console and the ensuing inventory search); and (2) the warrant was based on information that had become stale. [Doc. 22 at 5-12].  He asserts that probable cause to search was non-existent here.

The "fruit of the poisonous tree" doctrine holds that evidence should be suppressed when its discovery has come about as a result of the exploitation of a "primary illegality" whose taint has not been purged.  See Wong Sun v. United States, 371 U.S. 471, 487-488 (1963).  However, "[t]his doctrine does not apply where a search is legal."  United States v. Taylor, 592 F.3d 1104, 1108 (10th Cir. 2010) (where inventory search of vehicle was legal, statements made and evidence recovered during subsequent search of defendant's apartment were not excludable as fruits of poisonous tree).  Because I have previously concluded that the search of the Monte Carlo was valid, the "fruit of the poisonous tree" doctrine is inapplicable under the circumstances.

## 2.      Whether Probable Cause Supported the Warrant

Defendant next argues that officers did not possess probable cause to search either the Monte Carlo or his home at 213 Lorena Avenue. [Doc. 22 at 8].  He attacks the affidavit sworn out by Agent Verhulst in support of the search warrant as lacking any substantial basis for finding that probable cause existed, and maintains that there was nothing in the four corners of the affidavit to establish a nexus between any contraband or evidence to be discovered and the home at 213 North Lorena Avenue. [Doc. 39 at 6 ("While the affidavit states that officers believe that drug traffickers keep contraband in their homes, it fails to recite any facts which connect 213 N. Lorena to a crime.")].

A judge's decision to issue a warrant is entitled to "great deference" by a reviewing court.  Illinois v. Gates, 462 U.S. 213, 236 (1983).  Accordingly, a reviewing court "need only ask whether, under the totality of the circumstances presented in the affidavit, the

[issuing] judge had a 'substantial basis' for determining that probable cause existed." United States v. Artez, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting Gates, 462 U.S. at 238-39). The affidavit should be viewed "in a commonsense, nontechnical manner, with deference given in marginal cases to the prior determination of probable cause by the issuing authority." United States v. Rios, 611 F.2d 1335 (10th Cir.1979).  Finally, a search warrant must generally be upheld unless the issuing judge acted arbitrarily.  See, e.g., United States v. Allen, --- F.3d ----, 2010 WL 4343163, at *11 (5th Cir. Nov. 4, 2010).

It should be noted that Defendant's argument regarding a lack of probable cause is in large part based on his belief that evidence discovered as a result of Officer Garcia's inventory search was illegally obtained and, therefore, should not have been considered in the issuing magistrate's probable-cause analysis. [See Doc. 22 at 6-7 (insisting that inventory of Monte Carlo was nothing more than ruse to discover incriminating evidence and, consequently, evidence seized from the vehicle should not have been relied upon in subsequently obtaining search warrant)].  For reasons explained above, however, the Court does not accept Defendant's assessment.  Thus, it would have been entirely proper for the magistrate to have looked to the evidence seized from underneath the Monte Carlo's center console in determining the existence of probable cause.

Additionally, the information in the affidavit, which is based on task force officers' surveillance and personal observations, states that "[i]t appears that [Defendant] definitely lives at 213 N. Lorena." [Doc. 22; attached affidavit at 111].  Officers had observed Defendant park both the Volvo and the Monte Carlo in the driveway of 213 North Lorena

Avenue, and they had also seen him "numerous times coming and going from" the home. [Doc. 22; attached affidavit at 111]. Their months-long investigation had led them to believe that Defendant was selling large amounts of narcotics and routinely carrying large sums of money. In the affidavit, Agent Verhulst explained that his training and experience in the area of narcotics interdiction had caused him to form the belief that drug traffickers tend to keep narcotics, cash, drug-packaging materials, notes, ledgers, and other evidence of drug-trafficking sales and distribution "where the drug trafficker/drug dealer has ready access to them, such as [his] residence[ . . . ] and [his] vehicle[]. [See generally Exh. B-1]. All of these details were included within the four corners of the affidavit.

"[I]t is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key[,]" and "a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence." United States v. Grossman, 400 F.3d 212, 217 (4th Cir. 2005) (probable cause supported warrant to search defendant's home where, among other things, (1) confidential source advised that defendant sold cocaine and kept large quantities in stash houses; (2) source advised that defendant transported drugs in certain vehicles; and (3) law enforcement agents observed the described vehicles in the driveway of residence they sought to search). In this case, Agent Verhulst, stated that "[d]ue to the totality of the investigation, [he] believe[d] it [was] probable that [Defendant] utilizes the residence located at 213 N. Lorena as a location to store/stash the illicit substances he distributes." [Doc. 22; attached affidavit at 115]. A similar representation was deemed

notable in <u>United States v. Dawson</u>, wherein the Fourth Circuit affirmed the district court's denial of the defendant's motion to suppress, the district court specifically having found that where, among other things, evidence of drug dealing had been discovered in the defendant's vehicle, it was "likely and reasonable for . . . officers to believe that he was in fact concealing contraband in [his] house."   <u>United States v. Dawson</u>, 305 Fed.Appx. 149, 163 (4th Cir. 2008).

The Third Circuit follows the rule that "direct evidence linking the residence to criminal activity is not required to establish probable cause."  <u>United States v. Burton</u>, 288 F.3d 91, 103 (3rd Cir. 2002).  In that case, the court upheld the search of the defendant's home after evidence of drug dealing was discovered in the defendant's vehicle and he was arrested.  As the court explained, although "'probable cause to arrest does not automatically provide probable cause to search the arrestee's home . . . [i]f there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases.'"  <u>Id.</u> (<i>quoting</i> <u>United States v. Jones</u>, 994 F.2d 1051, 1055-56 (3d Cir.1993)).  While it is preferable that the supporting affidavit contain direct evidence linking the crime to the place to be searched, continued the court, probable cause nevertheless "can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide" evidence of the criminal activity.  <u>Burton</u>, 288 F.3d at 103 (internal quotations omitted).

In the present case the affidavit describes a months-long investigation of an individual who sold large quantities of both cocaine and methamphetamine out of the trunks of his cars. Defendant's two cars were seen, on a number of occasions, parked in the driveway of 213 Lorena Avenue, and he was observed entering and exiting the home at that address. Officers' CI also told them that he or she had "personally observed [Defendant] with large amounts of US Currency. . . ." [Doc. 22; attached affidavit at 112].  After Defendant was arrested and drugs, a digital scale, and several small, empty plastic baggies were discovered hidden under the center console in his vehicle, Agent Verhulst sought a warrant to search both the vehicle and the home at 213 Lorena Avenue, which he believed from training and experience was being used as a "quiet house" to store and stash illegal substances.

From the facts and allegations set out in the affidavit, it would be reasonable to infer that Defendant was involved in a substantial drug-trafficking operation.  Common sense dictates that he had to have stored his drug supplies, money, and other tools of the drug-dealing trade somewhere.  See Burton, 288 F.3d at 103 (noting that "evidence associated with drug dealing needs to be stored somewhere. . . .").  Based on the information included in the affidavit, the issuing magistrate could reasonably and logically have determined that Defendant was concealing evidence of criminal activity in his home and that, therefore, probable cause existed to search the residence.  See, e.g., Grossman, 400 F.3d at 217; Burton, 288 F.3d at 103.  Given the totality of the circumstances presented in the affidavit, this Court concludes that there was a substantial basis for determining that probable cause existed to search both the Monte Carlo and the home at 213 North Lorena Avenue.

### 3.    Staleness

Defendant's final argument in support of suppression is that the information on which the search warrant was based had become stale.  He submits that

> the affidavit alleges only a one-time shot of an alleged crime, *i.e.*, an uncorroborated statement by the informant that on April 21, 2010, Mr. Cruz had narcotics in the Monte Carlo. The search warrant was obtained and executed on April 29, 2010, eight days after the informant allegedly observed narcotics.

[Doc. 22 at 10].

It is true that "[w]here the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time." United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972).  Accordingly, the element of time is crucial to the concept of probable cause.  But where the facts indicate "activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant." Id.  In determining timeliness, it is important to do more than simply count "the number of days that have elapsed between the facts relied on and the issuance of the warrant. . . ." United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).  Rather, staleness "depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." Id. (internal citation omitted).

In this case, the information in the affidavit is indicative of a course of conduct that occurred and was monitored by law enforcement officers from at least February 2010, when Task Force agents began receiving reports of an "Hispanic male that drives a dark colored Volvo passenger car that is selling large amounts of methamphetamine in San Juan

County[,]" through April 29, 2010, when they arrested Defendant, searched the Monte Carlo, and applied for the search warrant. [See Doc. 22; attached "Affidavit for Search Warrant"]. In Snow, our Tenth Circuit rejected the argument that information accumulated by the FBI over the course of a five-week investigation was stale, since the defendant "was being investigated for running an ongoing, continuous operation to defraud the government[, and s]uch ongoing and continuous activity makes the passage of time less critical." Snow, 919 F.2d at 1460.   The situation is similar here, where Task Force agents conducted an investigation over the course of several months, collecting information based on their own observations and that provided by their CI, until they believed they were in possession of enough evidence to apply for a search warrant.   See id. ("The information gathered was cumulative in nature, requiring the F.B.I. to delay going before the magistrate until sufficient evidence was obtained.").   Because Defendant's activities here were continuous and ongoing, I am unpersuaded by his argument that the affidavit detailed "only a one-time shot of an alleged crime." [Doc. 22 at 10]

## III. CONCLUSION

The search of the Monte Carlo was not conducted in violation of the Fourth Amendment but, instead, was conducted as a valid vehicle inventory search.   The subsequently issued search warrant, which relied, in part, upon evidence seized during the inventory search, was based on probable cause.   Finally, information included in the affidavit supporting the search warrant was not stale.   Accordingly, there is no basis for excluding the

evidence obtained as a result of the searches in question.  *Defendant Perez Cruz's Motion to Suppress Evidence and Memorandum of Law in Support Thereof* will  be denied.

**IT IS THEREFORE HEREBY ORDERED** that *Defendant Oscar Perez Cruz's Motion to Suppress Evidence and Memorandum of Law in Support Thereof* [Doc. 22] is **DENIED**.

**SO ORDERED** this 26TH  day of April, 2011, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge